**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PATRICK MCKILLEN AND HUME STREET MANAGEMENT CONSULTANTS LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>JOHN DOES,<br><br>Defendants. | Civil Action No. 1:26-cv-04090-JGK |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR EARLY THIRD-PARTY DISCOVERY**

# TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 3

ARGUMENT ..... 5

I. Legal Standard for Early Discovery ..... 5

II. Plaintiffs Are Entitled to the Requested Early Discovery. ..... 6

A. Plaintiffs Have Set Forth a Prima Facie Case. ..... 7

1. Plaintiffs Have Stated a CFAA Claim. ..... 7

2. Plaintiffs Have Stated an SCA Claim. ..... 8

3. If this Court Reaches the Issue, Plaintiffs Have Sufficiently Shown Personal Jurisdiction at this Stage. ..... 10

a. Personal Jurisdiction Is Proper Under New York's Long-Arm Statute ..... 11

b. Alternatively, Personal Jurisdiction Is Proper Under Rule 4(k)(2). ..... 13

B. Plaintiffs' Requested Discovery is Specific and Narrowly Tailored. ..... 15

1. The Requests to the IP Service Providers Are Specific and Narrowly Tailored. ..... 15

2. The Requests to the Dissemination Entities Are Specific and Narrowly Tailored. ..... 16

C. Plaintiffs Cannot Obtain the Requested Information by Other Means. ..... 17

1. Discovery is Needed from the IP Service Providers. ..... 18

2. Discovery is Needed from the Dissemination Entities. ..... 18

D. The Information is Necessary for Plaintiffs' Claim to Proceed. ..... 19

E. Plaintiffs' Need for the Information Outweighs Any Expectation of Privacy. ..... 20

1. The John Does Have No, Or a Minimal, Privacy Interest in the Information Requested from the IP Service Providers. ..... 20

2. The John Does Have No, Or a Minimal, Privacy Interest in the Information Requested from the Dissemination Entities. .................. 21

III. Plaintiffs Should Be Granted Leave To Take Further Limited Discovery As Necessary. .......... 22

CONCLUSION .......... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A. v. Omnicom Grp., Inc.*,
2026 WL 504904 (S.D.N.Y. Feb. 24, 2026)....14

*Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*,
2020 WL 526404 (S.D.N.Y. Feb 3, 2020)....16

*Arista Records, LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010)....6

*Aurecchione v. Falco*,
2022 WL 3867929 (S.D.N.Y. Aug. 30, 2022)....6, 7, 16, 19

*Bank v. Doe*,
2021 WL 2548990 (E.D.N.Y. June 22, 2021)....2, 7

*Best Van Lines, Inc. v. Walker*,
490 F.3d 239 (2d Cir. 2007)....12

*Bloomberg, L.P. v. John Does 1-4*,
2013 WL 4780036 (S.D.N.Y. June 26, 2013)....10, 20

*Bullock v. Doe*,
2024 WL 671621 (N.D. Iowa Jan. 29, 2024)....20

*Digital Sin, Inc. v. Does 1-176*,
279 F.R.D. 239 (S.D.N.Y. 2012)....5, 6

*Digital Sin, Inc. v. Does 1-27*,
2012 WL 2036035 (S.D.N.Y. June 6, 2012)....11, 19

*Enneagram Personality Types, Inc. v. Kajtezovic*,
2025 WL 718977 (W.D.N.Y. Mar. 6, 2025)....18, 19

*Feldman v. Comp Trading, LLC*,
2021 WL 930222 (E.D.N.Y. Mar. 11, 2021)....8, 9

*Finan v. Lafarge S.A.*,
2025 WL 2504317 (E.D.N.Y. Aug. 29, 2025)....14

*Fuld v. Palestine Liberation Org.*,
606 U.S. 1 (2025)....14

*Obeid ex rel. Gemini Real Est. Advisors LLC v. La Mack*,
2017 WL 1215753 (S.D.N.Y. Mar. 31, 2017) ....................7, 10

*Goodman v. Goodman*,
2022 WL 17826390 (S.D.N.Y. Dec. 21, 2022) ....................7

*JBC Holdings NY, LLC v. Pakter*,
931 F. Supp. 2d 514 (S.D.N.Y. 2013)....................8

*John Wiley & Sons, Inc. v. Doe Nos. 1-30*,
284 F.R.D. 185 (S.D.N.Y. 2012) ....................15, 20

*Jordane Enters., LLC v. John Does 1-5*,
2021 WL 2555809 (S.D.N.Y. June 22, 2021) ....................19

*King v. Bon Charge*,
--- F. Supp. 3d ----, 2026 WL 1171386 (D. Del. Apr. 30, 2026) ....................14

*Kornotzki v. Jawad*,
2020 WL 2539073 (S.D.N.Y. May 19, 2020) ....................9

*Lensky v. Turk Hava Yollari, A.O.*,
2023 WL 6173334 (2d Cir. Sept. 22, 2023) .................... 13-14

*Licht v. Binance Holdings Ltd.*,
2026 WL 884205 (D. Mass. Feb. 20, 2026) ....................14

*LivePerson, Inc. v. 24/7 Customer, Inc.*,
83 F. Supp. 3d 501 (S.D.N.Y. 2015)....................8

*Malibu Media, LLC v. Doe*,
2016 WL 4574677 (E.D.N.Y. Sept. 1, 2016) ....................11, 20

*Malibu Media, LLC v. Doe No. 4*,
2012 WL 5987854 (S.D.N.Y. Nov. 30, 2012)....................15

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
84 F.3d 560 (2d Cir. 1996)....................13

*Microsoft Corp. v. Does 1–2*,
2022 WL 18359421 (E.D. Va. Dec. 27, 2022) ....................8

*Mirza v. Doe #1*,
2021 WL 4596597 (S.D.N.Y. Oct. 6, 2021).................... *passim*

*Porina v. Marward Shipping Co.*,
521 F.3d 122 (2d Cir. 2008)....................13

*Rotten Records, Inc. v. Doe*,
108 F. Supp. 3d 132 (W.D.N.Y. 2015)....................16

*SingularDTV, GmbH v. Doe*,
637 F. Supp. 3d 38 (S.D.N.Y. 2022)....................15, 19

*Sony Music Ent. Inc. v. Does 1-40*,
326 F. Supp. 2d 556 (S.D.N.Y. 2004)....................10, 19

*Strike 3 Holdings, LLC v. Doe*,
2019 WL 5459693 (S.D.N.Y. Oct. 9, 2019)....................6

*Strike 3 Holdings, LLC v. Doe*,
2025 WL 1685078 (D. Conn. June 16, 2025)....................18

*Strike 3 Holdings, LLC v. Doe*,
329 F.R.D. 518 (S.D.N.Y. 2019)....................6

*Trs. of Loc. 1034 Pension Tr. Fund v. Scepter Limousine Serv., Inc.*,
2023 WL 7222713 (E.D.N.Y. Nov. 2, 2023)....................7, 15

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
2023 WL 5322019 (S.D.N.Y. Mar. 8, 2023)....................16

*UN4 Prods., Inc. v. Doe–173.68.177.95*,
2017 WL 2589328 (E.D.N.Y. June 14, 2017)....................21

*Wiggins v. Unilever U.S., Inc.*,
684 F. Supp. 3d 127 (S.D.N.Y. 2023)....................11, 12

*William Gottlieb Mgmt. Co., LLC v. Carlin*,
2025 WL 3628151 (S.D.N.Y. Dec. 15, 2025)....................9, 10

*X Corp. v. World Fed'n of Advertisers*,
--- F. Supp. 3d ----, 2026 WL 833900 (N.D. Tex. Mar. 26, 2026)....................14

**Statutes**

18 U.S.C. § 1030....................1

18 U.S.C. § 1030(c)(4)(A)(i)(I)....................7

18 U.S.C. § 1030(e)(1)....................8

18 U.S.C. § 1030(g)....................7

18 U.S.C. § 2510(17)(A)....................10

18 U.S.C. § 2701....................1

18 U.S.C. § 2707 ........................................ 1

28 U.S.C. § 1781(b)(2) ........................................ 16

N.Y. C.P.L.R. § 302(a)(1) ........................................ 11

N.Y. C.P.L.R. § 302(a)(3) ........................................ 11, 12

**Other Authorities**

Fed. R. Civ. P. 4(k)(2) ........................................ 13, 14

Fed. R. Civ. P. 26 ........................................ 16

Fed. R. Civ. P. 26(b)(1) ........................................ 16, 17

Fed. R. Civ. P. 26(d) ........................................ 5

Fed. R. Civ. P. 26(f) ........................................ 2, 5, 22

Fed. R. Civ. P. 28(b) ........................................ 16

U.S. Const. amend. V ........................................ 13, 14

U.S. Const. amend. XIV ........................................ 12

This memorandum of law is made in support of Plaintiffs' concurrently filed Motion for Early Third-Party Discovery (the "Third-Party Discovery Motion").

**INTRODUCTION**

In this action, Plaintiffs Patrick McKillen ("Mr. McKillen") and Hume Street Management Consultants Limited ("HSMC"), bring claims under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701-07, against John Doe Defendants (the "John Does"). These claims arise from the John Does' involvement in a scheme to hack a Microsoft 365 account belonging to Plaintiffs' employee, obtain and download emails from the account (the "Hack"), and then have information from the Hack disseminated in a distorted manner to harm Plaintiffs (the "Hacking Scheme").

On information and belief, this scheme was intended to intimidate Plaintiffs and dissuade them from pursuing legal claims against Sheikh Hamad bin Khalifa Bin Hamad bin Abdullah bin Jassim bin Mohammed Al Thani ("HBK") and Sheikh Hamad bin Jassim bin Jaber bin Mohammed bin Thani Al Thani ("HBJ"), Plaintiffs' former business partners and members of the royal family of Qatar. The John Does hacked Plaintiffs' accounts and devices and retrieved personal, sensitive, and protected information (the "Hacked Materials").

Plaintiffs do not know the identity of the John Does, despite a thorough investigation. They accordingly bring the Third-Party Discovery Motion aimed at identifying the John Does. Plaintiffs request discovery from two groups possessing information that is likely to either disclose the John Does' identities or lead to the discovery thereof. First, Plaintiffs seek discovery from the entities that service the IP address associated with the Hacking Scheme (the "IP Service Providers"), *see* Third-Party Discovery Motion, Table A. Second, Plaintiffs seek discovery from a group of pay-

to-post services, content syndication services, and media outlets (the "Dissemination Entities"),[1] *see* Third-Party Discovery Motion, Table B, who disseminated the Hacked Materials by distorting information received from the John Does in fake articles and promoting/publishing those articles. The IP Service Providers and Dissemination Entities are located domestically and internationally, so Plaintiffs seek an order permitting them to issue subpoenas on the designated entities and for the Court to issue letters of request. In addition, or in the alternative, Plaintiffs seek permission to more generally conduct discovery designed to identify the John Does prior to the Rule 26(f) conference, which cannot be held until the John Does are identified. Because Plaintiffs do not know the identities of the John Does, this request is necessarily made *ex parte*.[2]

This Court should grant Plaintiffs' Third-Party Discovery Motion because it is reasonable

---

[1] As used in the Third-Party Discovery Motion and associated filings: (1) "pay-to-post services" means services through which customers pay to post or publish customer-submitted material on that service's website, such as EIN Presswire; (2) "content syndication services" means services that, for pay, have consumer-submitted materials posted or published on multiple websites or publications owned by other entities, such as Binary News Network; and (3) "media outlets" means services that publish or post material received from content syndication services or other sources but that have a direct pay-to-post functionality, such as the Valley City Times-Record. These categories overlap, though—some pay-to-post services, such as EIN Presswire, also syndicate their content to other platforms.

[2] *Ex parte* requests for early discovery to identify fictitiously named defendants are "routinely" granted. *See Mirza v. Doe #1*, 2021 WL 4596597, at *8 (S.D.N.Y. Oct. 6, 2021); *see also Bank v. Doe*, 2021 WL 2548990, at *3 (E.D.N.Y. June 22, 2021).

and supported by good cause.

## BACKGROUND

Mr. McKillen is the owner and director of HSMC, which manages a portfolio of properties on his behalf and has successfully provided project-management services for many hotels. *See* Dkt. No. 1 ("Compl.") ¶ 6. For years, Mr. McKillen and HSMC have been locked in legal disputes with HBK and HBJ. *Id.* ¶ 1. Those disputes center on whether HBK, HBJ, and entities they own have properly compensated Mr. McKillen—or compensated him at all—for work done in connection with a group of luxury hotels (the "Maybourne Hotel Group") and two private residences owned by HBJ. *See id.* As part of these disputes, Plaintiffs have brought civil actions in the United States, France, and the United Kingdom. *See id.* ¶ 20. Plaintiffs have already had success, *inter alia*, winning hundreds of millions of pounds in a London arbitration and having asset seizure orders issued as to assets of Constellation Paris, a company owned by HBK. *See id.* ¶¶ 19-21. Other actions remain pending. *See id.*

In the midst of these legal battles, and on the eve of the high-stakes London arbitration, unknown individuals (the John Does) hacked Mr. McKillen and HSMC. *See id.* ¶ 23. Through a cybersecurity attack, the John Does intentionally accessed a cloud-based Microsoft 365 account used by Mr. McKillen's assistant and gained access to thousands of emails hosted on the Microsoft 365 server. *See id.* ¶ 26. The emails contained private and confidential data, including data related to Mr. McKillen's disputes with HBK and HBJ. *See id.* ¶ 23. The John Does had no authorization to access the account or the emails; they gained access illegally via the cyberattack. *See id.* ¶ 26.

Plaintiffs believe the goal was to intimidate Mr. McKillen into dropping his cases against HBK and HBJ. *See id.* ¶ 43. Much of the unauthorized access to the account occurred about a month before the London arbitration. *See id.* ¶¶ 27, 49. Additionally, shortly after the Hack, information that could only have come from the Hacked Materials was disseminated (in distorted

fashion) in multiple articles in media outlets spanning the U.S., Canada, and the United Kingdom. *See id.* ¶¶ 28-29. The articles referenced data that could only have come from the Hacked Materials because it was confidential and not disclosed anywhere else, including (misrepresented) information about Mr. McKillen's expenditures and contacts that was never made publicly available. *See id.* ¶ 34 Some articles were disseminated by pay-to-post services, where users can pay to have submitted articles posted without independent journalism. *See id.* ¶¶ 30-31. Others were disseminated through content syndication services. *See id.* ¶¶ 32, 56. The John Does were responsible for having the Hacked Materials disseminated via these articles. *See id.* ¶ 3.

Plaintiffs learned of the Hack on April 7, 2025, and immediately began investigating the Hacking Scheme, hiring a forensic investigator three days later. *See id.* ¶¶ 23, 45. Over several months, investigators determined that the unauthorized accesses to the Microsoft 365 account were all associated with a single device with a single IP address (the "IP Address"). *See id.* ¶¶ 46-49. Although an automated computer code script may have been used to effectuate the unauthorized sign-in, that code script would have been created by the John Does. *See id.* ¶ 51.

The investigators determined that the IP Address was administered by GCI, a United-Kingdom-based IP service provider. *See id.* ¶ 53. GCI had leased the address to Lithuanian-based IP broker IPXO, who, in turn, leased the IP Address to IPRoyal, a proxy service provider with an office in New York. *See id.* Plaintiffs learned there are two different branches of IPXO: IPXO, UAB, based in Lithuania, and IPXO LLC, based in Texas. *See* Declaration of Samuel G. Hall ("Hall Decl.") ¶ 26.

Plaintiffs attempted to find those responsible for the Hacking Scheme. They investigated the dissemination of the Hacked Materials, reaching out to the media outlets that posted the articles and asking them to retain evidence. *See* Compl. ¶ 56. An agent for Plaintiffs also contacted the

owners of websites that had posted the Hacked Materials and related internet service providers and requested to know who originated the information, to no avail. *See id.* ¶ 57. The agent also spoke to members of a community that received the articles, which also failed to provide leads as to the John Does' identity. *See id.* Plaintiffs also reached out to law enforcement in the United Kingdom and Ireland (where Mr. McKillen resides), but they were unable to provide assistance in tracking down the John Does. *See id.* ¶ 55.

## ARGUMENT

Despite exhaustive efforts, Plaintiffs have been unable to ascertain the identities of the John Does. *See id.* ¶ 58. Plaintiffs therefore cannot serve them with process or meaningfully proceed with this action. Plaintiffs request that this Court permit limited, early discovery to help them identify the John Does: Plaintiffs seek discovery from the IP Service Providers listed in Table A and the Dissemination Entities listed in Table B. Both groups possess information likely to either disclose the John Does' identities or lead to the discovery thereof. The IP Service Providers can help determine the owners of the IP Address used in the Hack. The Dissemination Entities can provide information about where they received the articles containing distorted information from the Hacked Materials or where they received information derived from the Hacked Materials. Additionally, and in the alternative, Plaintiffs seek permission to generally conduct early discovery designed to identify the John Does prior to the Rule 26(f) conference. Such authorization would be narrowly tailored to learning the identity of the John Does and serve judicial efficiency.

### I. Legal Standard for Early Discovery

"Though parties generally may not initiate discovery prior to satisfying the meet and confer requirement of [Federal Rule of Civil Procedure] 26(f), courts may in some instances order earlier discovery." *Digital Sin, Inc. v. Does 1-176*, 279 F.R.D. 239, 241 (S.D.N.Y. 2012) ("*Digital Sin I*") (citing Fed. R. Civ. P. 26(d)). "Courts in this district have applied a 'flexible standard of

reasonableness and good cause' in determining whether to grant a party's expedited discovery request.'" *Id.*

Five "principal factors" bear on the reasonableness-and-good-cause determination. *Strike 3 Holdings, LLC v. Doe*, 2019 WL 5459693, at *1 (S.D.N.Y. Oct. 9, 2019); *see also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010). These include: (1) a plaintiff's ability to make out a "prima facie claim of actionable harm"; (2) "the specificity of the discovery request"; (3) "the absence of alternative means to obtain the subpoenaed information"; (4) "the need for the subpoenaed information to advance the claim"; and (5) "the objecting party's expectation of privacy." *Aurecchione v. Falco*, 2022 WL 3867929, at *8 (S.D.N.Y. Aug. 30, 2022) (citation modified). Other courts have weighed similar considerations without expressly applying the same multi-part test. *See, e.g.*, *Digital Sin I*, 279 F.R.D. at 241-42 (considering whether (1) plaintiffs alleged a prima facie case, (2) plaintiffs have no other ways of obtaining the identities of the defendants, (3) the information is necessary for the litigation to proceed, and (4) there are other factors weighing in favor of expedited discovery).

## II. Plaintiffs Are Entitled to the Requested Early Discovery.

This is a textbook case for early discovery. "Courts in this district routinely find 'good cause' for expedited discovery to determine the identity of John Doe defendants where a Plaintiff is able to make out a prima facie case and is otherwise unable to identify the Defendants without a court-ordered subpoena." *Strike 3 Holdings, LLC v. Doe*, 329 F.R.D. 518, 521 n.1 (S.D.N.Y. 2019); *see also Mirza v. Doe #1*, 2021 WL 4596597, at *8 (S.D.N.Y. Oct. 6, 2021).

Plaintiffs have shown the requisite reasonableness and good cause. *First*, they have set forth prima facie claims of actionable harm by pleading viable CFAA and SCA claims. *Second*, as to both the IP Service Providers and the Dissemination Entities, Plaintiffs' discovery requests are specific and accord with the law governing third-party subpoenas and letters of request. *Third*,

Plaintiffs have exhausted alternative means to obtain the information. *Fourth*, the requested discovery is necessary to identify the John Does and proceed with the case. *Fifth*, the John Does have no legitimate expectation of privacy in the information possessed by the IP Service Providers and the Dissemination Entities, and certainly not one that outweighs Plaintiffs' need for discovery.

This request is necessarily brought *ex parte*. Plaintiffs do not know the identities of the John Does and thus cannot inform them of this Third-Party Discovery Motion (or anything else about this case) until they are identified. Courts routinely grant *ex parte* requests for early discovery to identify John Does. *See Bank v. Doe*, 2021 WL 2548990, at *3 (E.D.N.Y. June 22, 2021).

**A. Plaintiffs Have Set Forth a Prima Facie Case.**

The first factor is whether Plaintiffs have made a prima facie showing of actionable harm and an entitlement to relief. *See Trs. of Loc. 1034 Pension Tr. Fund v. Scepter Limousine Serv., Inc.*, 2023 WL 7222713, at *2–3 (E.D.N.Y. Nov. 2, 2023); *Aurecchione*, 2022 WL 3867929, at *8. At this stage, this is only a preliminary determination as to whether Plaintiffs have a colorable case; the John Does will have an opportunity to challenge the Complaint once identified and served. Plaintiffs have met this low standard by pleading viable CFAA and SCA claims, so this factor weighs in favor of discovery.

**1. Plaintiffs Have Stated a CFAA Claim.**

The CFAA "imposes liability on a party who 'intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains … information from any protected computer.'" *Obeid ex rel. Gemini Real Est. Advisors LLC v. La Mack*, 2017 WL 1215753, at *7 (S.D.N.Y. Mar. 31, 2017). To bring a CFAA claim, a plaintiff must have suffered at least $5,000 in damage or loss during any 1-year period. *See* 18 U.S.C. §§ 1030(c)(4)(A)(i)(I), 1030(g); *see also Goodman v. Goodman*, 2022 WL 17826390, at *6 (S.D.N.Y. Dec. 21, 2022). That harm must

be economic. *See LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 511 (S.D.N.Y. 2015). Plaintiffs have pleaded all elements necessary to support a CFAA claim.

*First*, Plaintiffs have pleaded that the John Does intentionally accessed the Microsoft 365 account without authorization. *See* Compl. ¶ 70. The John Does launched a cyberattack to gain access to the Microsoft 365 Account to which they had no authority. *See id.* ¶¶ 23-25. This required knowing and intentional acts, including likely authoring a Python script. *See id.* ¶¶ 27, 51. That is more than sufficient. *See JBC Holdings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 521 (S.D.N.Y. 2013) ("There is no doubt that the CFAA applies to an 'outside' hacker who remotely enters a computer system without authority to do so.").

*Second*, Plaintiffs have pleaded that the John Does intentionally accessed and obtained information from a "protected computer." *See* Compl. ¶¶ 23-25, 65. "[A] protected computer is … a computer 'which is used in or affecting interstate or foreign commerce or communication.'" *LivePerson*, 83 F. Supp. 3d at 511. "[C]omputer" includes a "data storage facility or communications facility" that is connected with a computer. 18 U.S.C. § 1030(e)(1). Plaintiffs' Microsoft 365 Account qualifies. *See Microsoft Corp. v. Does 1–2*, 2022 WL 18359421, at *4 (E.D. Va. Dec. 27, 2022); *Feldman v. Comp Trading, LLC*, 2021 WL 930222, at *6 (E.D.N.Y. Mar. 11, 2021).

*Third*, Plaintiffs have alleged sufficient facts to meet the jurisdictional threshold of $5,000 in damage or loss. *See* Compl. ¶¶ 59-61, 76.

**2. Plaintiffs Have Stated an SCA Claim.**

Plaintiffs have also pleaded a prima facie SCA claim. "Civil liability under the SCA extends to whoever '(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic

communication while it is in electronic storage in such system[.]" *William Gottlieb Mgmt. Co., LLC v. Carlin*, 2025 WL 3628151, at *4 (S.D.N.Y. Dec. 15, 2025). Plaintiffs have pleaded that the John Does intentionally hacked a Microsoft 365 account and downloaded emails that were being held in electronic storage. *See* Compl. ¶ 25. This encompasses all required elements.

*First*, the John Does accessed "a facility through which an electronic communication service is provided." *William Gottlieb Mgmt.*, 2025 WL 3628151, at *4; *see* Compl. ¶ 83. "[C]ourts have concluded that facilities under the SCA are network service providers, which includes telephone companies, internet or e-mail service providers, and bulletin board services." *Kornotzki v. Jawad*, 2020 WL 2539073, at *3 (S.D.N.Y. May 19, 2020). The Microsoft 365 account at issue, which is hosted by Microsoft Online exchange, meets that standard. *See* Compl. ¶¶ 23-25; *see also Feldman*, 2021 WL 930222, at *4 (hacking a cloud-based email server was sufficient); *Kornotzki*, 2020 WL 2539073, at *3 (same).

*Second*, the John Does acted "without authorization." *William Gottlieb Mgmt.*, 2025 WL 3628151, at *4; *see* Compl. ¶ 83. "An individual can violate the SCA by either accessing an electronic communication without any authorization, or by exceeding the scope of the authorization that they possess." *William Gottlieb Mgmt.*, 2025 WL 3628151, at *6. The John Does had *no* authority whatsoever to access the Microsoft 365 account. Compl. ¶ 26.

*Third*, Plaintiffs have alleged the requisite intent. *See id.* ¶¶ 83-86. "In civil actions, the SCA requires that the acts were committed 'with a knowing or intentional state of mind.'" *William Gottlieb Mgmt.*, 2025 WL 3628151, at *6. "[T]he plaintiff in an SCA claim must prove that the defendant knew that he or she was not authorized to access the facility in question or knew that the access exceeded his or her authorization." *Id.* The John Does knew they were not authorized to access the account, yet they still repeatedly accessed it via hacking and downloaded emails from

it. *See* Compl. ¶¶ 25-26. They subsequently used the materials in a smear campaign against Plaintiffs. *See id.* ¶¶ 29, 43. All this reveals their knowing and intentional state of mind.

*Fourth*, through their unlawful access, the John Does "obtain[ed], alter[ed], or prevent[ed] authorized access to a wire or economic communication while it is in electronic storage." *William Gottlieb Mgmt.*, 2025 WL 3628151, at *4; *see id.* ¶ 83. "[E]lectronic storage" is, *inter alia*, "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof." 18 U.S.C. § 2510(17)(A). The John Does downloaded emails stored on Microsoft 365 servers. Compl. ¶¶ 23-26. That is obtaining information while it was in electronic storage. *See Obeid*, 2017 WL 1215753, at *9.

#### 3. If this Court Reaches the Issue, Plaintiffs Have Sufficiently Shown Personal Jurisdiction at this Stage.

This Court need not decide whether personal jurisdiction is proper over the John Does to authorize the requested discovery. Such an inquiry is premature in circumstances like these, as the information resulting from the third-party discovery is necessary to inform the personal-jurisdiction analysis. *See Bloomberg, L.P. v. John Does 1-4*, 2013 WL 4780036, at *4 (S.D.N.Y. June 26, 2013) ("[A] ruling on personal jurisdiction at this stage would be premature. Without the subpoenaed information, the Court has little basis on which to determine personal jurisdiction over Defendant. The Court declines to rule on the existence of personal jurisdiction and denies Defendant's Motion to the extent it challenges personal jurisdiction."); *Sony Music Ent. Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 567 (S.D.N.Y. 2004) ("This [personal-jurisdiction] argument is rejected as premature. First, this Court has the discretion to allow discovery to determine the basis for personal jurisdiction. Second, without the identifying information sought by plaintiffs in the Cablevision subpoena, it would be difficult to assess properly the existence of personal jurisdiction over the Doe defendants."). Accordingly, this Court should not delve into personal jurisdiction

until the John Does are identified.

Should the Court examine personal jurisdiction, any analysis would be preliminary. *See Digital Sin, Inc. v. Does 1-27*, 2012 WL 2036035, at *3 (S.D.N.Y. June 6, 2012) ("*Digital Sin II*") (stating "personal jurisdiction is a waivable defense," and courts "will not presume that any of the Doe defendants will assert it" and indicating that the plaintiff's jurisdictional allegations were "sufficient at this stage of the proceedings" and that it was satisfied that the plaintiff had alleged enough facts "for present purposes"); *Malibu Media, LLC v. Doe*, 2016 WL 4574677, at *4 (E.D.N.Y. Sept. 1, 2016) ("*Malibu Media I*") (allegations were "sufficient at this stage to establish personal jurisdiction such that … expedited discovery … is appropriate"). Plaintiffs have alleged more than enough to satisfy this standard under two different theories.

**a. Personal Jurisdiction Is Proper Under New York's Long-Arm Statute**

This Court has personal jurisdiction pursuant to New York's long-arm statute. "To exercise personal jurisdiction over a defendant, 'there must be a statutory basis for personal jurisdiction'" and "'the exercise of personal jurisdiction must comport with due process principles.'" *Wiggins v. Unilever U.S., Inc.*, 684 F. Supp. 3d 127, 143 (S.D.N.Y. 2023). Both are satisfied here.

*First*, statutory jurisdiction is proper. Under N.Y. C.P.L.R. § 302(a), courts may exercise personal jurisdiction over non-domiciliary defendants where those defendants "transact[] any business within the state" or "commit a tortious act without the state causing injury to person or property within the state … if he … expects or reasonably should expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." N.Y. C.P.L.R. § 302(a)(1), (3). Here, statutory personal jurisdiction is proper under either prong. As to the former, this Court considers (1) the "totality of the defendant's activities

within the forum" and (2) whether there is "an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (citation modified). The John Does transacted with the IB Times, a New York business, to disseminate the Hacked Materials in New York. *See* Compl. ¶¶ 29-32. Additionally, the John Does reasonably should have expected the Hack and subsequent dissemination of the Hacked Materials, which expressly refer to Mr. McKillen's pending litigations, including New York litigation, *see id.* ¶ 35, to have consequences for Mr. McKillen's reputation and business practices in New York. *See* N.Y. C.P.L.R. § 302(a)(3).

*Second*, the exercise of personal jurisdiction comports with the due-process requirements of the Fourteenth Amendment. This Court has, at minimum, specific personal jurisdiction. "Three conditions must be met for the exercise of specific jurisdiction to be proper: (1) the defendant must have purposefully availed itself of the privileges of conducting activities within the forum State or have purposefully directed its conduct into the forum State; (2) the Plaintiffs' claims must arise out of or relate to the defendant's forum conduct; and (3) the exercise of jurisdiction must be reasonable under the circumstances." *Wiggins*, 684 F. Supp. 3d at 144 (citation modified).

These requirements are met. The John Does *both* purposefully availed themselves of the privileges of conducting activities within New York *and* purposefully directed their conduct into New York. They intentionally transacted with a media outlet in New York—the IB Times—to have articles containing the Hacked Materials disseminated in New York. *See* Compl. ¶¶ 29-32. Additionally, the John Does executed the Hack with a device that had an IP Address ultimately falling under the administration of IPRoyal, an IP service provider with a New York office. *See id.* ¶ 53. As to purposeful direction, the John Does (1) had the Hacked Materials disseminated in New York via the IB Times; (2) had articles published discussing Mr. McKillen's suits against

HBK and HBJ, including his New York lawsuit, likely to try to intimidate Mr. McKillen into dropping those lawsuits; and (3) intentionally sought to harm Mr. McKillen and HSMC's reputations in New York. These actions plainly relate to Plaintiffs' hacking-based CFAA and SCA claims.

Finally, the reasonableness element is satisfied. New York has an interest in ensuring that its IP service providers and media outlets are not used as part of a cyberattack scheme, and Plaintiffs have an interest in the "convenient and effective relief" this Court can provide. *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) (reasonableness inquiry considers, *inter alia*, "the interests of the forum state in adjudicating the case" and "the plaintiff's interest in obtaining convenient and effective relief"); *see also* Compl. ¶ 12 (indicating that many relevant witnesses will be in New York).

**b. Alternatively, Personal Jurisdiction Is Proper Under Rule 4(k)(2).**

Alternatively, Plaintiffs have sufficiently alleged personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2). This Rule "allows the exercise of personal jurisdiction by a federal district court when three requirements are met: (1) the claim must arise under federal law; (2) the defendant must not be 'subject to jurisdiction in any state's courts of general jurisdiction'; and (3) the exercise of jurisdiction must be consistent with the United States Constitution and laws." *Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008) All three are met here.

*First*, Plaintiffs' claims arise under the CFAA and the SCA, federal statutes, and thus indisputably arise under federal law. *Second*, if the John Does are not subject to jurisdiction in New York, they are not subject to jurisdiction in any state. *Third*, Plaintiffs have shown that the exercise of personal jurisdiction comports with the Constitution, specifically the Fifth Amendment's due process clause, which applies in Rule 4(k)(2) cases, *see Lensky v. Turk Hava*

*Yollari, A.O.*, 2023 WL 6173334, at *2 (2d Cir. Sept. 22, 2023). The John Does have sufficient ties with the U.S. as a whole to justify personal jurisdiction by a federal court.[3] Besides their New York connections, the John Does also reached out to at least *ten other* U.S.-based pay-to-post services, content syndication services, and media outlets spanning the nation to have the Hacked Materials disseminated. They transacted with Dissemination Entities in States from South Dakota to Florida, including using pay-to-post services like EIN Presswire, headquartered in D.C., and

[3] That is especially true given that "the Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 16 (2025). Courts have applied this more flexible inquiry to cases arising under Rule 4(k)(2). *See Finan v. Lafarge S.A.*, 2025 WL 2504317, at *16 (E.D.N.Y. Aug. 29, 2025) ("The court finds that under the broader reading of federal jurisdiction for matters concerning the United States a sovereign embraced by the Supreme Court in *Fuld*, Rule 4(k)(2) provides a proper basis for this court's exercise of personal jurisdiction over Defendants."); *see also King v. Bon Charge*, --- F. Supp. 3d ----, 2026 WL 1171386, at *3-4 (D. Del. Apr. 30, 2026) (Bibas, J.); *X Corp. v. World Fed'n of Advertisers*, --- F. Supp. 3d ----, 2026 WL 833900, at *11-12 (N.D. Tex. Mar. 26, 2026); *Licht v. Binance Holdings Ltd.*, 2026 WL 884205, at *6–7 (D. Mass. Feb. 20, 2026). But this Court need not decide the question of personal jurisdiction at this stage. Nor does it need to decide whether the *Fuld* standard applies because it has personal jurisdiction under the traditional minimum-contacts analysis. *See A.A. v. Omnicom Grp., Inc.*, 2026 WL 504904, at *7 n.1 (S.D.N.Y. Feb. 24, 2026) (declining to resolve this question because the plaintiff satisfied the more stringent test, so "it necessarily satisfie[d] any more 'flexible' inquiry").

content syndication services like Binary News Network, based in California.

### B. Plaintiffs' Requested Discovery is Specific and Narrowly Tailored.

The next good-cause consideration is the specificity of the requested discovery. *See Scepter Limousine Serv.*, 2023 WL 7222713, at *3. Requests that sweep beyond the information necessary to identify and serve fictitiously-named defendants are unlikely to be granted. *See SingularDTV, GmbH v. Doe*, 637 F. Supp. 3d 38, 42-43 (S.D.N.Y. 2022) ("Courts have therefore denied expedited discovery where a plaintiff's subpoena 'swept broadly' by seeking documents other than those concerning the identity and location of an unknown accountholder." (citation modified)). In contrast, requests narrowly tailored to seeking information regarding a defendant's identity, such as name, email address, or other identifying information, are appropriate. *See Malibu Media, LLC v. Doe No. 4*, 2012 WL 5987854, at *3 (S.D.N.Y. Nov. 30, 2012) ("*Malibu Media II*") ("Likewise, Malibu's subpoena's request is highly specific in nature: it seeks the name, current and permanent address, e-mail address, and Media Access Control (MAC) Address of each Doe defendant, attempting to obtain enough information to identify and serve the defendants."); *Mirza*, 2021 WL 4596597, at *8 (similar); *John Wiley & Sons, Inc. v. Doe Nos. 1-30*, 284 F.R.D. 185, 190 (S.D.N.Y. 2012) (similar).

#### 1. The Requests to the IP Service Providers Are Specific and Narrowly Tailored.

Plaintiffs solely seek identifying information from the IP Service Providers. Specifically, they will request documents and communications related to (1) the identity of users associated with the IP Address, (2) the physical location of users associated with the IP Address, (3) other contact information of the users associated with the IP Address, (4) the online presence and records of users associated with the IP Address, and (5) the ownership and leasing of the IP Address. *See, e.g.*, Hall Decl. ¶¶ 31-32; Hall Decl. Exs. 1-2. The requested discovery "is crucial for service and

asks for no more than what is needed to identify and serve [the John Does]." *Aurecchione*, 2022 WL 3867929, at 9; *see also Rotten Records, Inc. v. Doe*, 108 F. Supp. 3d 132, 134 (W.D.N.Y. 2015) ("Plaintiff has also met the specificity requirement, insofar as Plaintiff seeks the name and address of the individual assigned IP address … for the limited purpose of enabling Plaintiff to serve process on Defendant.").

Additionally, Plaintiffs' proposed subpoenas and letters of request are proper. "The information requested in the subpoena must be consistent with Rule 26(b)(1), meaning that the information must be relevant to the claims and defenses and proportional to the needs of the case." *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 2020 WL 526404, at *2 (S.D.N.Y. Feb 3, 2020). Plaintiffs' subpoenas on IPRoyal and IPXO LLC will seek only extremely limited (in time and scope), highly relevant information necessary for the case to proceed, and as such will pose only a minimal burden. Likewise, the proposed letters of request (in certain circumstances, referred to as letters rogatory) are proper. "Rule 28(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1781(b)(2) authorize federal courts to issue letters rogatory that enable a U.S. litigant to obtain non-party discovery from a foreign entity." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2023 WL 5322019, at *1 (S.D.N.Y. Mar. 8, 2023). "In considering the issuance of letters rogatory, U.S. courts apply the discovery principles contained in Rule 26." *Id.* The information requested is both limited (as evidenced by the five narrow questions mentioned above) and not only highly probative but *necessary*: without it, the case cannot proceed.

### 2. The Requests to the Dissemination Entities Are Specific and Narrowly Tailored.

Plaintiffs also seek minimal identifying information from the Dissemination Entities, specifically only documents and communications related to the individuals, entities, or accounts who shared information with the Dissemination Entities, namely their: (1) identity, (2) physical

location, (3) other contact information, (4) online presence and records, and (5) IP addresses. *E.g.*, *see* Hall Decl., ¶¶ 43-44; Hall Decl. Exs. 3-5. This discovery is narrowly focused on identifying the John Does and is not broader than necessary, as it does not request anything beyond the bare minimum to proceed with this case. Additionally, for the same reasons given above, the subpoenas and letters of request are proper because they request information within the contours of Rule 26(b)(1) that is relevant and necessary for this case to proceed, and, as seen by their narrow inquiries, Plaintiffs seek only the absolutely minimum information necessary to identify the John Does.[4]

### C. Plaintiffs Cannot Obtain the Requested Information by Other Means.

Plaintiffs have undertaken an extensive and costly investigation to ascertain the John Does' identities, but they have been unable to do so. *First*, they engaged a digital forensics and investigations firm to investigate the Hack and find those responsible. *See* Compl. ¶¶ 45-46. The firm conducted a months-long investigation that involved sifting through over 90.2 GB of data and 266,000 email messages and identifying, extracting, and preserving data to determine the extent, method, and origin of the unauthorized access. *See id.* ¶¶ 46, 50. *Second*, Plaintiffs, through counsel, tracked down the disseminations of the Hacked Materials and reached out to the media outlets that had posted them in hopes of stopping the spread of distorted private information and identifying the John Does. *See id.* ¶¶ 55-56. *Third*, where feasible, an agent for Plaintiffs contacted

---

[4] Plaintiffs request a subpoena for MobiusTrend (who may be located in Hong Kong but whose precise location is difficult to verify) based on representations from the Legal Department at MobiusTrend that they would comply with a duly-issued subpoena. *See* Hall Decl., Ex. 9 at 3 ("We will . . . cooperate fully with a formal legal order, such as a subpoena or a verified request from law enforcement authorities, provided it is correctly addressed to our legal entity.").

media outlets, IP service providers, and members of a faith-based community that had received the Hacked Materials. *See id.* ¶ 57. *Fourth*, Plaintiffs reported the conduct to law enforcement agencies. *See id.* ¶ 55.

Despite these diligent efforts, Plaintiffs have not been able to identify the John Does. They have two promising leads: the IP Address used in the Hacking Scheme and the articles containing the Hacked Materials. But to follow up on either, they need discovery.

**1. Discovery is Needed from the IP Service Providers.**

Plaintiffs cannot tie the IP Address to known individuals without additional information maintained by IPRoyal, GCI, and IPXO (including both contracting parties, IPXO, UAB and IPXO LLC),[5] *see* Hall Decl. ¶ 30, necessitating this discovery request, *see Strike 3 Holdings, LLC v. Doe*, 2025 WL 1685078, at *5 (D. Conn. June 16, 2025) (observing that a third-party subpoena was necessary because "only [the provider] know[s] who a given IP Address is assigned to" and "[t]here is no public registry of IP addresses or alternative source for this information"). Additionally, privacy policies like those of IPXO and IPRoyal, which suggest information will only be disclosed subject to a subpoena rather than voluntarily, *see* Hall Decl. Exs. 7-8, show that Plaintiffs have no other options except for court-ordered discovery. *See Enneagram Personality Types, Inc. v. Kajtezovic*, 2025 WL 718977, at *6 (W.D.N.Y. Mar. 6, 2025).

**2. Discovery is Needed from the Dissemination Entities.**

Despite issuing cease-and-desist letters and requesting that the Dissemination Entities voluntarily disclose anything regarding the information they received in connection with the articles, Plaintiffs have not been able to identify the John Does. Plaintiffs have been met with

---

[5] Because they share information, both IPXO, UAB and IPXO LLC likely possess information regarding the users of the IP Address. *See* Hall Decl. ¶¶ 26, 28.

redirection and disclaimers that many of the Dissemination Entities were not engaged in authoring; they merely republished materials sent to them. Some entities have terms of service that do not permit disclosure under circumstances like these absent a court order. *See* Hall Decl., Ex. 12 at 10-11, 13; *Enneagram Personality Types, Inc.*, 2025 WL 718977, at *6. One entity stated that it "cannot voluntarily disclose the personal contact information, telephone numbers, or digital identities of our contributors based solely on a cease-and-desist letter." Hall Decl., Ex. 9 at 3. Consequently, Plaintiffs need formal legal discovery to determine who paid for the articles containing the Hacked Materials to be disseminated. *See Jordane Enters., LLC v. John Does 1-5*, 2021 WL 2555809, at *1 (S.D.N.Y. June 22, 2021).

### D. The Information is Necessary for Plaintiffs' Claim to Proceed.

Identifying the John Does is a prerequisite for this case to continue. "To recover for any damages, Plaintiffs must know who the Defendants actually are and serve process." *Mirza*, 2021 WL 4596597, at *8; *see also Sony Music*, 326 F. Supp. 2d at 566 ("Ascertaining the identities and residences of the Doe defendants is critical to plaintiffs' ability to pursue litigation, for without this information, plaintiffs will be unable to serve process."). Courts regularly find that information regarding the identity of fictitiously-named defendants is crucial and justifies early discovery. *See Aurecchione*, 2022 WL 3867929, at *9; *Mirza*, 2021 WL 4596597, at *8. Unlike where early discovery has been denied, *see SingularDTV*, 637 F. Supp. 3d at 44 (explaining that plaintiff was already receiving information about John Doe defendants' identity from other sources), Plaintiffs have no other avenues to identify the John Does.[6]

[6] With respect to the IP Service Providers, there is a risk that relevant identifying information will be deleted in the ordinary course. *See Digital Sin II*, 2012 WL 2036035, at *4 ("Expedited discovery is also necessary to prevent loss of the requested information and as a result

### E. Plaintiffs' Need for the Information Outweighs Any Expectation of Privacy.

The final consideration is whether "Plaintiffs' need for the subpoenaed information outweighs Defendant's expectation of privacy and anonymity." *Bloomberg*, 2013 WL 4780036; *see also Malibu Media I*, 2016 WL 4574677, at *7 (considering "whether the defendant has an expectation of privacy" and determining that any such interest was "minimal"). Here, the John Does are cybercriminals who violated federal law by intentionally hacking Plaintiffs. Their privacy interests are nonexistent or, at best, minimal, and in either event are certainly outweighed by Plaintiffs' need for the information.

#### 1. The John Does Have No, Or a Minimal, Privacy Interest in the Information Requested from the IP Service Providers.

It is hard to see how the John Does can have any privacy interest in the information they submitted to the IP Service Providers—let alone one that outweighs Plaintiffs' need for identifying information so that this case can proceed. Courts have held that Internet users generally have "a minimal expectation of privacy" in their IP addresses when they are using those addresses for unlawful conduct. *See Malibu Media I*, 2016 WL 4574677, at *7; *cf. Bullock v. Doe*, 2024 WL 671621, at *1 (N.D. Iowa Jan. 29, 2024) ("A person has a 'minimal' expectation of 'privacy in their contact information disclosed to an internet service provider,' and this privacy interest is outweighed by Bullock's need for the information to obtain relief."). Such a minimal privacy interest is easily overcome by Plaintiffs' need for the information to hold Defendants accountable. Additionally, if a defendant agrees to terms of service indicating that their information may be disclosed to comply with lawful requests, they have an even lesser expectation of privacy. *See John Wiley & Sons*, 284 F.R.D. at 191; *cf. Mirza*, 2021 WL 4596597, at *9. Here, IP Service

---

of routine deletion by the ISPs."). That, too, weighs in favor of early discovery.

Providers' terms of service make clear that any expectation of privacy is minimal in relation to court orders. *See* Hall Decl. Ex. 7 at 8-9 (IPXO Privacy Policy saying, "IPXO may disclose information about you to … private parties as required by law to comply with a legal or regulatory obligation. We may disclose and use such information as we believe necessary and appropriate to … comply with applicable laws and lawful requests and legal processes, such as to respond to subpoenas or requests from government authorities … [and] protect, investigate and deter against fraudulent, harmful, unauthorized, unethical or illegal activity."); Hall Decl., Ex. 8 at 29 (IPRoyal Privacy Policy saying, "We may also transfer Your personal data … if we are required to do so by law or during legal proceedings or … in connection with an investigation into suspected or actual fraudulent or illegal activities.").

**2. The John Does Have No, Or a Minimal, Privacy Interest in the Information Requested from the Dissemination Entities.**

Nor do the John Does' privacy interests—if any—in their dealings with the Dissemination Entities outweigh Plaintiffs' need for this information. This case does not implicate the disclosure of information related to sensitive materials, which might strengthen the privacy interest. *See UN4 Prods., Inc. v. Doe–173.68.177.95*, 2017 WL 2589328, at *3 (E.D.N.Y. June 14, 2017). Nor would disclosing the information subject the users "to retaliatory physical or mental harm." *Mirza*, 2021 WL 4596597, at *9 (considering this interest in determining whether Yelp users had an expectation of privacy). In fact, as in *Mirza*, the John Does are likely "on constructive notice" that their information may be disclosed by at least some of the Dissemination Entities. For example, the Privacy Policy of EIN Presswire, a pay-to-post service, provides that users' data may be disclosed "when required by law or in good-faith belief that disclosure is necessary to … [c]omply with legal obligations … [and] [p]revent or investigate wrongdoing." Hall Decl., Ex. 10 at 4. The same is true, *inter alia*, for Financial Content and the IB Times. *See* Hall Decl., Exs. 11 at 3, 12 at 13.

More generally, especially with respect to the pay-to-post entities and the content syndication services, it is hard to see how users could have any reasonable expectation of privacy in such activities, which fall far outside any type of protected conduct.

## III. Plaintiffs Should Be Granted Leave To Take Further Limited Discovery As Necessary.

Additionally, and in the alternative, Plaintiffs seek permission to more generally conduct early discovery designed to identify the John Does prior to the Rule 26(f) conference. The ability to issue additional subpoenas in response to information Plaintiffs receive after the submission of their Third-Party Discovery Motion would serve the interests of efficiency, judicial economy, and justice by preventing Plaintiffs from having to repeatedly return to the Court to seek further leave. It also increases the likelihood that the John Does will be identified. These additional subpoenas would be limited in nature and seek only the same narrow identifying information as those described above, *see supra* at 15-17.

## CONCLUSION

For those reasons, this Court should grant the Third-Party Discovery Motion because it is reasonable and supported by good cause. Plaintiffs should be permitted to serve discovery on the IP Service Providers and the Dissemination Entities. Additionally, and in the alternative, Plaintiffs should be permitted to take further early-discovery from other entities with materials that identify the John Does.

Dated: June 10, 2026

Respectfully Submitted,

**WILLKIE FARR & GALLAGHER LLP**

By: *<u>/s/ Samuel G. Hall</u>*

Michael J. Gottlieb
2029 Century Park East
Los Angeles, CA 90067

(310) 855-3111
mgottlieb@willkie.com

Samuel G. Hall (*Pro Hac Vice*)
1875 K Street NW
Washington, DC 2006
(202) 303-1443
shall@willkie.com

*Attorneys for Plaintiffs*

**WORD COUNT VERIFICATION**

I, Samuel G. Hall, certify that according to the word count of the word-processing software used to prepare the foregoing memorandum of law, and exclusive of the excluded portions excluded, there are 6,982 words in the document, so this document complies with the Individual Practices of Judge John G. Koeltl.

Dated: June 10, 2026

Respectfully Submitted,

By: */s/ Samuel G. Hall*

Samuel G. Hall
1875 K Street NW
Washington, DC 2006
(202) 303-1443
shall@willkie.com

*Attorney for Plaintiffs*